# No. 22-2764

## United States Court of Appeals
## for the Second Circuit

AARON KATZEL,
*Plaintiff-Appellant*,

v.

AMERICAN INTERNATIONAL GROUP, INC.,
*Defendant-Appellee*,

PETER SOLMSSEN, LUCY FATO,

*Defendants*.

On Appeal from the United States District Court
for the Southern District of New York (No. 20-cv-7220(AKH))
(Alvin K. Hellerstein, J.)

### PLAINTIFF-APPELLANT'S OPENING BRIEF

Daniel Woofter
GOLDSTEIN, RUSSEL &
  WOOFTER, LLC
1701 Pennsylvania Ave., NW
Suite 200
Washington, DC 20006
(202) 240-8433

Neal Brickman
THE LAW OFFICES OF NEAL
  BRICKMAN, P.C.
420 Lexington Ave.
Suite 2811
New York, NY 10170
(212) 986-6840

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION .............................................................................1

JURISDICTION.................................................................................2

STATEMENT OF ISSUES ................................................................3

STATEMENT OF THE CASE............................................................4

    I.    LEGAL BACKGROUND..........................................................4

        a.    The Sarbanes-Oxley Act of 2002 ..................................4

        b.    SEC rules governing internal controls and procedures ..........................6

        c.    SOX whistleblower protections ..............................10

    II.    FACTUAL BACKGROUND.....................................................12

        a.    Aaron Katzel was hired as a senior attorney at AIG just after the SEC required the company to overhaul its internal controls and procedures. ..........................12

        b.    Katzel reported apparent violations of AIG's internal controls during the valuation of a significant company asset..........................15

        c.    AIG fired Katzel shortly after the Compliance Department investigated and substantiated his concerns. ..........................21

        d.    AIG further retaliated against Katzel by eliminating his performance equity shortly after he filed his whistleblower-retaliation complaint. ..........................24

    III.    PROCEDURAL BACKGROUND ...........................................25

        a.    OSHA proceedings ..................................................25

        b.    District court proceedings .......................................27

SUMMARY OF ARGUMENT ...........................................................31

STANDARD OF REVIEW ................................................................38

ARGUMENT ...................................................................................38

    I.    A JURY COULD FIND THAT KATZEL WAS TERMINATED IN RETALIATION FOR ENGAGING IN SOX-PROTECTED ACTIVITY. ..........................38

a.  A jury could find that Katzel "reasonably believed" he reported potential violations of "any rule or regulation" of the SEC or shareholder fraud. ..................................................39

b.  A jury could find that AIG was aware that Katzel engaged in protected activity..................................................48

c.  A jury could find that Katzel's protected activity was a "contributing factor" in AIG's decision to terminate him. ...................49

II.  THE DISTRICT COURT ERRED IN FAILING TO ADDRESS KATZEL'S POST-TERMINATION RETALIATION CLAIM. ..............................................54

III.  THE DISTRICT COURT ERRED IN HOLDING THAT KATZEL IS NOT ENTITLED TO ANY OF HIS ACCRUED EQUITY. ..............................................55

a.  The parties agree that under the express terms of the relevant contracts, Katzel is entitled to the equity that had already vested when he was terminated..................................................55

b.  AIG cannot condition the receipt of an earned benefit on Katzel forgoing his whistleblower rights. ..........................................58

IV.  THE DISTRICT COURT ERRED IN HOLDING THAT KATZEL FAILED TO IDENTIFY A VALID AND ENFORCEABLE AGREEMENT WITH UBS. .................60

CONCLUSION ........................................................................................62

ii

# TABLE OF AUTHORITIES

## Cases

*Guyden v. Aetna, Inc.*,
  544 F.3d 376 (2d Cir. 2008) ................................................................. 11, 32, 41

*Jeffreys v. City of New York*,
  426 F.3d 549 (2d Cir. 2005) ................................................................. 53

*Lawson v. FMR LLC*,
  571 U.S. 429 (2014) ................................................................. 5

*Murray v. UBS Sec., LLC*,
  43 F.4th 254 (2d Cir. 2022), *petition for cert. filed*, No. 22-660 (U.S. Jan.
  18, 2023) ................................................................. 36, 50

*Nielsen v. AECOM Tech. Corp.*,
  762 F.3d 214 (2d Cir. 2014) ................................................................. 11, 33, 42

*Ogelsby v. W. Stone & Metal Corp.*,
  230 F. Supp. 2d 1184 (D. Or. 2001) ................................................................. 53

*Perez v. Progenics Pharms., Inc.*,
  965 F. Supp. 2d 353 (S.D.N.Y. 2013) ................................................................. 53

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) ................................................................. 42

*Stuart's, LLC v. Edelman*,
  196 A.D.3d 711 (N.Y. App. Div. 2021) ................................................................. 60, 61

*Tolan v. Cotton*,
  572 U.S. 650 (2014) ................................................................. 38

*Van Asdale v. Int'l Game Tech.*,
  577 F.3d 989 (9th Cir. 2009) ................................................................. 34, 44, 45, 47

*Walsh v. New York City Hous. Auth.*,
  828 F.3d 70 (2d Cir. 2016) ................................................................. 51

*Wiest v. Lynch*,
  710 F.3d 121 (3d Cir. 2013). ................................................................. 33, 43

*Zann Kwan v. Andalex Grp. LLC*,
  737 F.3d 834 (2d Cir. 2013) ................................................................. 36, 51

*Ziparo v. CSX Transportation, Inc.*,
  15 F.4th 153 (2d Cir. 2021) ................................................................. 38

iii

# Statutes

18 U.S.C. § 1514A ............................................................ passim

18 U.S.C. § 1514A(a)(1) .................................................. passim

18 U.S.C. § 1514A(a)(2) .................................... 11, 36, 58, 60

18 U.S.C. § 1514A(b)(1) ...................................... 2, 3, 25, 27

18 U.S.C. § 1514A(b)(1)(A) ....................................... 2, 25

18 U.S.C. § 1514A(b)(1)(B) ......................................... 2, 3

28 U.S.C. § 1291 ............................................................ 3

28 U.S.C. § 1331 ............................................................ 3

28 U.S.C. § 1332 ............................................................ 3

Sarbanes-Oxley Act of 2002,
   Pub. L. No. 107-204, 116 Stat. 745 (2002) ................... passim

# Regulations

17 C.F.R. § 240.13a-15 .............................................. 6, 41

17 C.F.R. § 240.13a-15(a) ......................................... passim

17 C.F.R. § 240.13a-15(c) ............................................ 6

17 C.F.R. § 240.13a-15(e) .......................................... 6, 7

17 C.F.R. § 240.13a-15(f) ............................................ 6

17 C.F.R. § 240.15d-15 .............................................. 6, 41

17 C.F.R. § 240.15d-15(a) ............................... 6, 7, 32, 40

17 C.F.R. § 240.15d-15(c) ............................................ 6

17 C.F.R. § 240.15d-15(e) .......................................... 6, 7

17 C.F.R. § 240.15d-15(f) ............................................ 6

17 C.F.R. § 240.21F-17(a) ............................................ 58

# Rules

Fed. R. Civ. P. 59(e) .............................................. 3, 29, 30

Fed. R. Civ. P. 60 ................................................. 3, 29, 30

# Other Authorities

AIG, Annual Report (Form 10k) (Mar. 2, 2009) ......................................................13

*Certification of Disclosure in Companies' Q. & Ann. Reps.*,
Release No. 8124 (Aug. 28, 2002) ............................................................... passim

Final Judgment as to Defendant AIG, *SEC v. AIG*,
No. 06-cv-01000 (S.D.N.Y. Feb. 17, 2006), ECF No. 5 .....................................13

*Hendrix v. Am. Airlines, Inc.*,
2004 WL 5345479 (Dep't of Labor Dec. 9, 2004)....................................... 11, 54

*In re Activision Blizzard, Inc.*,
Release No. 96796 (Feb. 3, 2023) ............................................................... passim

*In re First Am. Fin. Corp.*,
Release No. 92176 (June 14, 2021)................................................................. 9, 10

*In re Guggenheim Securities, LLC*,
Exchange Act Release No. 92237 (June 23, 2021) ............................................58

*In re The Brink's Company*,
Exchange Act Release No. 95138 (June 22, 2022) ............................................58

*Katzel v. AIG*,
(No. 2019-SOX-00014, Mar. 18, 2019) (ALJ) ........................................... passim

*McClendon v. Hewlett Packard, Inc.*,
2006 WL 6577175 (Dep't of Labor Oct. 5, 2006) ................................. 11, 36, 54

Petition for Writ of Certiorari, *Murray v. UBS Secs., LLC*
(U.S. Jan. 18, 2023) (No. 22-660) ................................................................. 35, 50

Press Release, SEC, *AIG to Pay $800 Million to Settle Securities Fraud
Charges by SEC* (Feb. 9, 2006)........................................................................12

S. Rep. No. 107-146 (2002) ................................................................................ 5, 42

*Sylvester v. Parexel Int'l LLC*,
ARB No. 07-123 (ARB May 25, 2011) (en banc) ........................... 33, 42, 43, 47

## INTRODUCTION

Plaintiff Aaron Katzel was a high performing executive for defendant American International Group, Inc., until his unlawful termination in 2017. After a decade as an exemplary employee, he was fired after alerting AIG's compliance officers and General Counsel that "the company and its shareholders" could be harmed by compliance violations he witnessed, as well as material weaknesses in the compliance policies the Securities and Exchange Commission required AIG to implement in 2006. When Katzel then sued, alleging that he was unlawfully terminated for engaging in activity protected by the whistleblower provisions of the Sarbanes-Oxley Act of 2002 (SOX), AIG responded by threatening to eliminate over $1.2 million in performance equity he had earned over his decade with the company unless he waived and released his pending claim. When Katzel refused to do so, AIG directed UBS, the third-party holder of Katzel's equity, to enter a zero balance on his accounts. The question here is whether any of AIG's conduct was lawful.

There are four relevant claims on appeal: a SOX retaliatory termination claim; a SOX post-termination retaliation claim; a New York breach of contract claim for AIG's violation of the contracts governing Katzel's performance bonuses; and a tortious interference with contract claim for AIG's interference with Katzel's brokerage and custodial agreement with UBS.

1

After discovery closed in federal district court, AIG moved for summary judgment. Within three days of Katzel filing his opposition, the court granted AIG's motion—without holding a hearing, addressing any of his arguments, or addressing any of the over 1,250 pages of supporting evidence he submitted. The court held that no jury could find Katzel even *reasonably believed* he had reported a violation of an SEC rule or regulation or shareholder fraud, as required to establish protected activity under the Sarbanes-Oxley Act, because he failed to *also* show that the company "*had* defrauded shareholders or intended to deceive clients or shareholders." SA16. Because the court believed Katzel could not prove that he had engaged in protected activity, it further held that no jury could find that AIG's executives were aware he had engaged in protected activity or fired him because of it. The court subsequently granted summary judgment to AIG on Katzel's state law claims as well.

This Court should reverse every one of those holdings and remand for a trial.

## JURISDICTION

Plaintiff was terminated on May 4, 2017, and timely filed his initial complaint with the Occupational Safety and Health Administration (OSHA) on October 27, 2017. 18 U.S.C. § 1514A(b)(1)(A). He then timely exercised his statutory right to move the action to federal court on September 3, 2020. 18 U.S.C. § 1514A(b)(1)(B).

The district court had jurisdiction under 28 U.S.C. § 1331; 18 U.S.C. § 1514A(b)(1)(B); and 28 U.S.C. § 1332.

On September 23, 2022, the district court granted summary judgment to defendant on plaintiff's federal claims and declined to exercise supplemental jurisdiction over his state law claims. SA1-18. The court entered final judgment on September 30, 2022. SA19. Plaintiff timely noticed an appeal on October 20, 2022. JA2355-2356.

On October 28, 2022, defendant filed a motion to amend the judgment under Federal Rules of Civil Procedure 59(e) and 60, seeking summary judgment on plaintiff's state law claims. JA2357-2373. The district court granted the motion over plaintiff's opposition and entered an amended opinion on November 28, 2022, granting summary judgment to defendant on the remaining state law claims. SA20-28. The court entered final judgment that same day, SA29, and plaintiff timely noticed this appeal on December 7, 2022, JA2489-2490. This Court has jurisdiction over the final judgment under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Did the district court err in holding that no rational jury could find that plaintiff engaged in SOX-protected activity?

2. Did the district court err in holding that no rational jury could find that AIG executives were aware that plaintiff engaged in SOX-protected activity?

3

3. Did the district court err in holding that no rational jury could find that plaintiff's SOX-protected activity was a contributing factor in AIG's decision to terminate him?

4. Did the district court err in holding that plaintiff was required to sign an award acceptance agreement during the pendency of his whistleblower retaliation suit to receive his final performance equity award?

5. Did the district court err in holding that plaintiff was ineligible to receive any of his accrued performance equity, whether vested or not, unless he waived and released his pending whistleblower-retaliation claims?

6. Did the district court err in holding that plaintiff could only pursue his tortious interference with contract claim if he waived and released his pending whistleblower-retaliation claims?

7. Did the district court err in holding that plaintiff failed to identify a valid and enforceable agreement with UBS?

## STATEMENT OF THE CASE

### I.   LEGAL BACKGROUND

#### a.   The Sarbanes-Oxley Act of 2002

Congress passed the Sarbanes-Oxley Act in the wake of several massive accounting fraud scandals to deter corporate fraud and rehabilitate publicly traded companies through comprehensive reforms related to accounting procedures,

disclosure and governance practices, and whistleblower protections. S. Rep. No. 107-146, at 2-11 (2002); *see Lawson v. FMR LLC*, 571 U.S. 429, 432 (2014).

"As directed by Section 302(a) of the Sarbanes-Oxley Act," the SEC then "adopt[ed] rules to require an issuer's principal executive and financial officers each to certify" not just "the financial" and accounting information required in an "issuer's quarterly and annual reports," but also the "*other information* contained in the issuer's quarterly and annual reports," to protect a public company's shareholders by ensuring that they are periodically provided all the material financial and other information that might affect the price of their stock. *Certification of Disclosure in Companies' Q. & Ann. Reps.*, Release No. 8124 (Aug. 28, 2002), 2002 WL 31720215, at *1 (emphasis added). To ensure that issuers have the necessary systems, policies, and processes to reliably generate accurate and timely disclosures, the "rules also require these officers to certify that: they are responsible for establishing, maintaining and regularly evaluating the effectiveness of the issuer's internal controls; they have made certain disclosures to the issuer's auditors and the audit committee of the board of directors about the issuer's internal controls;" and "they have included information in the issuer's quarterly and annual reports about their evaluation and whether there have been significant changes in the issuer's internal controls or in other factors that could significantly affect internal controls subsequent to the evaluation." *Ibid.*

5

"In addition," the SEC separately adopted "previously proposed rules to require issuers to maintain, and regularly evaluate the effectiveness of, disclosure controls and procedures designed to ensure that the information required in reports filed under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported on a timely basis." Release No. 8124, 2002 WL 31720215, at *1.

### b. SEC rules governing internal controls and procedures

1. Exchange Act Rules 13a-15 and 15d-15 require publicly traded companies to maintain and regularly evaluate their internal controls and procedures. *See* 17 C.F.R. § 240.13a-15; 17 C.F.R. § 240.15d-15.

At the same time as promulgating rules governing an "issuer's internal control over financial reporting" and accounting, *see* 17 C.F.R. § 240.13a-15(c), (f); 17 C.F.R. § 240.15d-15(c), (f), the SEC issued "disclosure controls and procedures" rules that expressly extend beyond financial reporting and accounting controls, *see* 17 C.F.R. § 240.13a-15(a)-(b), (e); 17 C.F.R. § 240.15d-15(a)-(b), (e).

These rules governing disclosure controls and procedures were enacted "to assist principal executive and financial officers in the discharge of their responsibilities in making the required certifications" in the periodic reports described above. Release No. 8124, 2002 WL 31720215, at *9. And to "discharge their responsibilities in providing accurate and complete information to security holders, it is necessary for companies to ensure that their internal communications

6

and other procedures operate so that important information flows to the appropriate collection and disclosure points in a timely manner." *Ibid.*

The SEC "differentiate[d]" the "concept of disclosure controls and procedures from the pre-existing concept of 'internal controls' that pertains to an issuer's financial reporting and control of its assets." Release No. 8124, 2002 WL 31720215, at *7; *see* 17 C.F.R. § 240.13a-15(e); 17 C.F.R. § 240.15d-15(e). The SEC made "this distinction … to have senior officers certify that required material non-financial information, as well as financial information, is included in an issuer's quarterly and annual reports." Release No. 8124, 2002 WL 31720215, at *7. Thus, the SEC "maintain[ed] the pre-existing concept of internal controls" over financial reporting "without expanding it by relating it to non-financial information," while at the same time adopting Exchange Act Rules 13a-15(a) and 15d-15(a) to govern internal and external reporting processes related to material non-financial information. *See ibid.*

As a result, Exchange Act Rules 13a-15(a) and 15d-15(a) "complement existing requirements for reporting companies to establish and maintain systems of internal controls with respect to their financial information." Release No. 8124, 2002 WL 31720215, at *9. These requirements "cover a broader range of information than is covered by an issuer's internal controls related to financial reporting." *Ibid.* "The procedures should capture information that is relevant to an assessment of the need

7

to disclose developments and risks that pertain to the issuer's businesses," and should "ensure that an issuer's systems grow and evolve with its business." *Ibid.*

2.  Given the broader scope of the term "disclosure controls and procedures," the SEC regularly takes enforcement action against companies for disclosure control failures unrelated to financial reporting or accounting, even when there are no allegations of shareholder fraud, and no material misstatement has been made to shareholders.

Most recently, in February 2023 the SEC settled an enforcement action against Activision Blizzard, Inc., for $35 million, after finding that the company failed to maintain disclosure controls and procedures related to non-financial information—in that case, internal controls to ensure that the company could assess whether its disclosures pertaining to its workforce were adequate. *In re Activision Blizzard, Inc.*, Release No. 96796 (Feb. 3, 2023), 2023 WL 1765354, at *1. Activision Blizzard "acknowledged that attracting, retaining, and motivating a workforce of employees with specialized skills is particularly important to its business." *Ibid.* But the SEC found that "the company lacked controls and procedures designed to ensure that information related to employee complaints of workplace misconduct would be communicated to Activision Blizzard's disclosure personnel to allow for timely assessment on its disclosures." *Id.* at *1. According to the SEC, this violated Exchange Act Rule 13a-15(a). *Id.* at *1-2.

8

The SEC did not allege that any statement or disclosure was materially inaccurate or misleading, or that shareholder fraud had otherwise occurred. It was enough, according to the Commission, that when a public company "fails to implement and maintain disclosure controls and procedures as required, its management *may* not have adequate information to assess whether the disclosures it makes to investors are fulsome, accurate, and not misleading by omission." *Activision Blizzard*, 2023 WL 1765354, at *2 (emphasis added). "Disclosure controls and procedures," the SEC reaffirmed, "'are intended to cover a broader range of information than is covered by an issuer's internal controls related to financial reporting' and 'should capture information that is relevant to an assessment of the need to disclose developments and risks that pertain to the issuer's businesses.'" *Ibid.* (quoting Release No. 8124, 2002 WL 31720215, at *9).

Similarly, in June 2021, the SEC settled claims with First American Financial Corporation for alleged failures of the company's internal controls "related to disclosures made in connection with a cybersecurity vulnerability." *In re First Am. Fin. Corp.*, Release No. 92176 (June 14, 2021), 2021 WL 2439179, at *1. Again, there were no allegations of any inaccurate or misleading statement in a corporate disclosure or that shareholders had been defrauded. Instead, just as in *Activision Blizzard*, the SEC charged that the inadequacy of First American Financial's disclosure controls and procedures itself violated Exchange Act Rule 13a-15(a),

because the weaknesses undermined the ability of the company's managers to have all relevant information about the cybersecurity vulnerability when they assessed the company's related disclosure and the magnitude of the resulting risk. *Id.* at *1, *5.

### c. SOX whistleblower protections

As noted above, Congress also included whistleblower protections in the Sarbanes-Oxley Act to help identify and deter corporate fraud. Thus, Section 806 provides a private right of action to employees who are punished for reporting certain violations enumerated in the statute.

Section 806(a)(1) protects employees who provide information "regarding any conduct which the employee reasonably believes constitutes a violation of," as relevant here, "any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders." 18 U.S.C. § 1514A(a)(1). When an employee provides such information to "a person with supervisory authority over the employee" or any company official who "has authority to investigate, discover, or terminate misconduct," it is unlawful for the company to "discharge, demote, suspend, threaten, harass, or in any other manner discriminate against [the] employee in the terms and conditions of employment" for doing so. *Ibid.*

"[A] whistleblower need not show that the corporate defendant committed fraud to prevail in her retaliation claim under § 1514A." *Guyden v. Aetna, Inc.*, 544

F.3d 376, 384 (2d Cir. 2008). Rather, the whistleblower need only prove that he "'reasonably believed' that the defendant's conduct violated federal law." *Ibid.* (quoting 18 U.S.C. § 1514A(a)(1)). When a whistleblower subjectively believes he is alerting his employer to a violation of an SEC rule or regulation or shareholder fraud, and that belief is objectively "reasonable," his warnings are protected. *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 221 (2d Cir. 2014).

In addition, Section 806(a)(2) protects plaintiffs from employer retaliation for filing and pursuing a whistleblower claim. Under that subsection, it is unlawful to punish an employee who decides "to file" a whistleblower-retaliation claim and "participate in" such civil action. 18 U.S.C. § 1514A(a)(2). Unlike the provision governing internal reporting, which requires a "reasonable belief" that an enumerated violation has occurred, subsection (a)(2) protects a plaintiff merely for pursuing a claim "relating to an *alleged* violation … of any rule or regulation" of the SEC or shareholder fraud. *Ibid.* (emphasis added). "Therefore, the filing of a whistleblower complaint is a SOX protected activity," even if the allegations are ultimately found wanting. *See McClendon v. Hewlett Packard, Inc.*, 2006 WL 6577175, at *76 (Dep't of Labor Oct. 5, 2006); *see also Hendrix v. Am. Airlines, Inc.*, 2004 WL 5345479, at *9 (Dep't of Labor Dec. 9, 2004) ("[F]iling a whistleblower complaint with OSHA is itself protected activity.").

## II.  FACTUAL BACKGROUND

### a.  Aaron Katzel was hired as a senior attorney at AIG just after the SEC required the company to overhaul its internal controls and procedures.

1.  At the time plaintiff Aaron Katzel was hired by AIG, the company had just settled a massive enforcement action, agreeing to implement wide-ranging internal financial and disclosure controls required by the SEC.

In February 2006, the SEC filed and settled "charges that [AIG] committed securities fraud." Press Release, SEC, *AIG to Pay $800 Million to Settle Securities Fraud Charges by SEC* (Feb. 9, 2006), https://tinyurl.com/2s2ewu3w. The settlement was "part of a global resolution of federal and state actions under which AIG" agreed to "pay in excess of $1.6 billion" to resolve the claims. *Ibid.* Critically, AIG agreed to "undertake corporate reforms designed to prevent similar misconduct from occurring." *Ibid.*

As a result of the SEC's investigation and settlement, AIG was required to implement a range of corporate reforms not just to its internal financial controls and accounting practices, but also to its controls related to compliance and corporate governance more generally. Among other things, the settlement required AIG to hire a consultant approved by the SEC and Attorney General of New York who would examine and recommend changes to "AIG's internal controls over financial reporting," as well as the "policies, procedures and effectiveness of AIG's

regulatory, compliance and legal functions, including the operations of any committees established to review and approve transactions," and "AIG's records management and retention policies and procedures." Final Judgment as to Defendant AIG, *SEC v. AIG*, No. 06-cv-01000 (S.D.N.Y. Feb. 17, 2006), ECF No. 5, at 9-11; *see also id.* at 23 (requiring AIG to continue implementing other "corporate governance reforms").

This was all taking place when Katzel was hired as a senior lawyer in AIG's Financial Services Division later that year. *See* JA184. Among his job duties, Katzel was brought on to counsel consumer and commercial finance businesses on significant commercial transactions and disputes, as well as compliance matters. *Ibid.*; JA2208. At various times over the course of his employment, Katzel directly participated in the legal and compliance departments' multi-year initiatives to develop and adopt enhanced internal controls and procedures in response to the SEC-mandated consultant's reports and recommendations. *Cf.* JA2208.

Thus, from the very beginning of his employment at AIG, Katzel understood that the company was implementing new conflict-of-interest, confidentiality, and record-keeping policies as part of the reforms required in the SEC's settlement with AIG. Those internal controls were further enhanced and expanded in the aftermath of AIG's bailout during the financial crisis just a few years later. *See* AIG, Annual Report (Form 10k) (Mar. 2, 2009), https://tinyurl.com/2p944xfw (describing

"implementation of remediation efforts to address the material weakness in controls over fair value valuation of the AIGFP super senior credit default swap portfolio and oversight thereof that was in existence at December 31, 2007"); JA1388-1391; *see also* JA1552.

2. During his tenure with AIG, Katzel was promoted four times. JA970-974; JA2208. Katzel's four separate supervisors at AIG rated his job performance at the same level or superior to that of his peer group every year that he was there— including General Counsel Peter Solmssen, who ultimately terminated Katzel. JA975-1092. And in every year of his tenure, AIG increased Katzel's overall compensation package. *See* JA975-1092; JA2208. There is no dispute that Katzel was never issued a performance warning, let alone subjected to a formal performance improvement plan, as would have been customary for poorly performing employees at AIG.

In 2011, Katzel was promoted to lead AIG's Legal Operations Center (LOC). The LOC was responsible for "reducing or controlling AIG's external legal costs and spending," as well as creating and managing AIG's legal data and analytics infrastructure; building and maintaining AIG's legal technology infrastructure; establishing and managing all aspects of the economic and contractual relationships for the more than 1,500 law firm offices and non-firm legal services providers that AIG and its insurance claims department worked with globally; and leading the legal

14

department's operational process efficiency and automation programs. JA1092-1096. The LOC's clients were other internal departments of AIG. Katzel received numerous industry awards for his work leading the LOC. JA1106; JA1177-1178.

### b. Katzel reported apparent violations of AIG's internal controls during the valuation of a significant company asset.

Shortly before Katzel was terminated, he observed and reported several apparent violations of various compliance policies that were implemented pursuant to AIG's settlement with the SEC, leading him to believe there were material weaknesses in the internal control environment that could result in harm to "the company and its shareholders." *See* JA202. These violations occurred in the context of a carve-out transaction that AIG's independent outside advisors estimated to have an equity value of over $750 million.

1. In 2016, AIG approved a major transaction to carve out the LOC into an independent business that would offer its services not only to AIG but to other Fortune 500 companies. JA1255-1257. The effort was dubbed "Project Kalahari," and AIG set aside $14 million for the development and launch of the business. JA1367-1368. AIG retained Oliver Wyman as an independent outside expert, who estimated that the new business had a potential equity value of $757 million. *See* JA1266-1299. AIG also engaged a law firm to represent the company as an investor, primary shareholder, and customer in the potential spinoff—all in pursuit of then Chief Executive Officer Peter Hancock's strategy to develop non-insurance sources

15

of income for AIG. JA1302; JA1351-1353; JA2208. That strategy would be accomplished by enabling the carved-out business to achieve greater scale and generate income for AIG at a time when the company was operating at a loss. JA1302-1303.

AIG tasked its Corporate Development team with determining the value the spinoff would have to AIG, and then overseeing the process through which AIG as a shareholder, customer, and investor would negotiate the terms of the carve out. JA1389-1391. However, over the course of several months, Katzel observed suspicious activity involving members of the Corporate Development and Claims Operations teams, including apparent violations of the very conflict-of-interest, confidentiality, and document-retention policies that the SEC required AIG to implement in 2006. These apparent violations led Katzel to believe that, instead of seeking to maximize the value of the carve-out business for AIG's shareholders, the Corporate Development team was attempting to fraudulently mislead AIG's executive leadership on the value of the carve-out to divert a significant business opportunity to Accenture, a competitor.

Katzel's suspicions proved more than reasonable. Charith Perera, the leader of AIG's Claims Operations group, had previously coordinated an unauthorized attempt with third-party Accenture to outsource the services provided by the LOC. JA1632-1634; *see* JA1210-1217. And evidence shows that the Corporate

Development team had been working with Perera and Accenture from the outset to shrink the LOC and outsource its work, rather than maximize the value the potential LOC carve-out would have to AIG's shareholders. *Ibid.*

Specifically, Katzel observed members of the Claims Department and the Corporate Development team share, without authorization, confidential business information regarding the LOC's operating model and cost structure with Accenture. JA1181 (Corporate Development team member testifying that he "shared AIG data and LOC's high level cost structure" with Accenture, and that "Perera and Lina Hu were the two AIG employees" in the Claims Department "who were … the main contact" with Accenture), JA1404 (same), JA1662-1663 (Compliance Department testimony that Hu shared "Firm confidential" information with Accenture regarding "$18.2 million worth of operational LOC costs"). Katzel did not authorize the Corporate Development team "to give competitively sensitive information" relating to the LOC to Accenture, expressly warning that the company could "use it to poach employees/try to build the business off our work," given that "Accenture does procurement services and has done so for AIG previously." JA1722-1723.

After improperly sharing the data, Perera emailed Accenture employees during Project Kalahari conveying that he "[w]as able to use the LOC model" and was "working on a plan around it," but the "struggle is that [AIG's] GC's office is pursuing" the carve-out joint venture with AIG "and they want to see" this "pet

17

project … through." JA1620. As it turns out, Accenture was also actively bidding against the potential LOC spinoff for a multi-year contract with a large financial institution to provide the same analytics, sourcing, and procurement services. *See* JA1627-1630, JA1691-1692, JA1694. Indeed, Accenture eventually won the bid. *See* SEALEDA12-28. Thus, at the same time Accenture was helping Perera and the Corporate Development team to undermine the LOC carve-out effort, it was competing against the potential LOC spinoff in a formal bid to provide the same services to the same potential client.

In a separate instance, Katzel observed apparent violations of AIG's SEC-mandated records-management policies. That suspicious behavior arose in connection with internal surveys the Corporate Development team conducted to support a lowball valuation of the carve-out business to mislead AIG's executive leadership into terminating Project Kalahari. *See* JA327-333. In summarizing the results of its survey, the Corporate Development team asserted that internal clients were dissatisfied with the LOC's services and a spinoff would not be able to attract clients. JA320-325. But that conclusion significantly diverged from data collected by external advisor Oliver Wyman, who had previously documented the exceptionally positive views of AIG senior executives regarding the LOC and its services. JA1264. Separately, the head of AIG's Casualty Claims group, one of the LOC's largest internal clients, independently expressed concerns to Katzel "during

the survey that it was being conducted in ways that led him to be highly suspicious of the motivations of the team that was conducting the survey and the integrity of the process." JA1306-1307.

When Katzel inquired about the significant discrepancies, noting that the views of internal clients "do not align at all to what [wa]s captured" in the Corporate Development team's summary of its survey results, Konstanty Owczarek—the team member assigned to lead the Project Kalahari valuation—asserted that he had "shredded the survey." JA1584.[1]

In late 2016, Katzel alerted the Corporate Development team that he "had concerns that the process was not being conducted in a way that would lead AIG to be able to extract the best possible value out of the asset for the company and its shareholders." JA1309. Katzel was concerned that there "was intentional misrepresentation as part of that process," and "that the data that would have allowed executive leadership to reach their own conclusions about the value of the asset were not being presented to executive leadership in an honest way." JA1340-1341. The head of the Corporate Development team privately admitted that Katzel was "not

---

[1] Although it is not relevant to what Katzel reasonably believed at the time, it later emerged in discovery that the surveys had not, in fact, been destroyed. *See* JA933. If anything, Owczarek's contrary suggestion is a red flag that substantiates Katzel's belief that the Corporate Development team was intentionally working to undermine the spinoff effort.

19

wrong" that the team "lack[ed] … commitment" to the process. JA1570; *see* JA1557-1558.

2. Ignoring Katzel's concerns, the Corporate Development team recommended that AIG's executives terminate Project Kalahari. *See* JA560-562. Around the same time, AIG appointed a new General Counsel, Peter Solmssen, and in October 2016, Solmssen supported terminating the carve-out effort based, in part, on the Corporate Development team's recommendation. JA607-611; *see* JA1491.

By the time Solmssen informed Katzel that Project Kalahari had been terminated, Katzel had developed serious concerns that the Corporate Development and Claims Operations teams had violated the SEC-mandated conflict-of-interest, confidentiality, and document-retention policies in a coordinated effort to tank Project Kalahari, by undermining the value of a significant company asset and diverting a commercial opportunity to a competitor. He thus reported his concerns to the Compliance Department during AIG's annual SOX fraud assessment.[2]

In connection with the company's annual SOX fraud-risk assessment, Katzel sought guidance from AIG's Compliance Department on how to appropriately report

---

[2] In its motion for summary judgment, AIG sought to undermine the credibility of Katzel's reported concerns by pointing out that, in connection with an annual Code of Conduct training, completed *before* he reported the suspicious activities he observed, Katzel selected "No" to the general question: "Do you have any violations of the Code of Conduct, AIG policy, law or regulation to report?" JA614.

his concerns regarding what he witnessed during Project Kalahari. *See* JA1876. To that end, he had a series of meetings and calls with senior AIG compliance professionals Scott Horton, Marie McCormack (Horton's supervisor), and eventually chief compliance officer Karen Nelson. *See* JA1652-1654; JA1900-1901.

Based on the guidance he received from them, Katzel reported in the company's SOX fraud-risk questionnaire that, although at that time he did "not have any *specific* knowledge of any fraud that would fall into" the discrete, limited "categories described" in the questionnaire, he had related concerns about suspicious activities and compliance violations arising due to material weaknesses in the internal controls designed to protect against fraud. JA1874 (emphasis added). Given the red flags he observed during Project Kalahari, Katzel conveyed to Horton that "it would be worthwhile for you, me, [McCormack], and [Nelson] to evaluate the advisability of review and testing on the robustness of conflict of interest protections in the processes followed by certain functions responsible for significant transactions at the company," to "support our ability to make and implement decisions that maximize shareholder value in such transactions." JA1874; *see* JA1610 (providing documentary evidence).

### c. AIG fired Katzel shortly after the Compliance Department investigated and substantiated his concerns.

1. Although the Compliance Department pursued an unusually limited and informal investigation of Katzel's allegations, *see* JA1899; JA1902-1903; JA1906-

1912; JA1914-1918, it nonetheless *substantiated* his concern that the company's confidentiality policies had been violated.

At the conclusion of its investigation, the Compliance Department issued a set of talking points that chief compliance officer Nelson communicated directly to General Counsel Solmssen. JA1955-1956 (talking points); *see* JA1906. Nelson relayed that her team's compliance investigation was conducted as part of a response to "the Fraud Risk Assessment process," and she reported that Katzel "brought [Project Kalahari] to Corporate Compliance's Financial Crimes Group's … attention." JA1955. Nelson conveyed that Katzel's concerns prompted the Compliance Department "to review the matter from a conflict of interest perspective and to ensure the company was consistently follow[ing] rigorous processes and procedures to support the decision-making process with respect to potential transactions." JA1955. Nelson explained that Katzel "was concerned that Accenture was potentially a bidder for AIG legal outsource services or a competitor to the LOC." *Ibid.*

As Nelson communicated to Solmssen, the Compliance Department found that the LOC's "cost structure analysis" was undeniably "AIG Firm Confidential Information," and that providing it to Accenture "*arguably violate[d]* the AIG Global Information Handling Standards." JA1955-1956 (emphasis added). The Compliance Department thus recommended certain remedial actions. JA1956.

22

In early February 2017, Nelson told Katzel that "compliance had found that there was a legitimate basis" for his concerns and that his "concerns were valid." JA1328; *see also* JA1979. Solmssen, too, relayed that he appreciated Katzel "bringing it to his attention." JA1329.

2. In early March 2017, Solmssen met with Katzel and formally delivered a positive performance review that Solmssen's expectations had been "Fully Met" and awarded Katzel his full discretionary performance bonus. *See* JA1088. In late March and mid-April 2017 respectively, AIG quietly adopted a new Strategic Transactions Policy and Conflicts of Interest Policy—addressing the very weaknesses in the internal control environment about which Katzel had reported concerns. *See* JA1568 (new AIG Corporate Development Policy issued March 31, 2017); JA1981-1984 (AIG Global Employee Conflict of Interest Policy updated April 13, 2017).

Just weeks after quietly amending the very policies at the heart of Katzel's reported concerns, AIG abruptly terminated him with no warning. On May 4, 2017, Solmssen summoned Katzel to his office and summarily fired him without cause, terminated his access to the company's IT system, and had him escorted out of the building. *See* JA2211. On the same day Katzel was terminated, the Compliance Department asked a member of the Corporate Development team "to follow-up on our previous conversation about having Accenture confirm they have destroyed all

AIG Company Information provided to it, any deliverables they produced, and all copies of either." JA1987.

> **d.** **AIG further retaliated against Katzel by eliminating his performance equity shortly after he filed his whistleblower-retaliation complaint.**

Katzel was entitled to performance equity he had earned over ten years with AIG, totaling over $1.2 million. Even AIG agrees that the terms of its equity contracts with Katzel entitled him to any equity that had already vested and been delivered at the time he was terminated. *See* JA109 (AIG only arguing that "terminated employees, like Katzel, are not entitled to LTIP Compensation that was awarded *but unvested* prior to their termination").

But after Katzel informed AIG that he had retained counsel to represent him regarding his termination, AIG repeatedly reached out to Katzel, threatening that if he did not sign the 2017 Award Agreement applicable to his final award and a full waiver and release of any potential claims against the company, it would terminate all the performance equity he had accumulated over the years. *See, e.g.*, JA814; JA816; JA 830-831 (July 24, 2017 email from AIG that: "As indicated below, you have a short window left to accept your 2017 LTI awards or they will be cancelled"); JA841-842 (release agreement).

Katzel refused to sign any waiver or release while his whistleblower retaliation complaint was pending. "At the time … the company requested that I

24

enter into the award agreement," Katzel testified, "this dispute was already pending." JA173. He relayed that "during the pendency of a dispute, my expectation would be that ordinarily" any "sort of provision" requiring him to release his claims "would be stayed." *See ibid.*

Nevertheless, AIG responded by instructing UBS—the third-party custodian of Katzel's performance equity under AIG's Long Term Incentive equity compensation plan (LTIP)—to enter a zero balance on Katzel's accounts, eliminating all of the approximately $1.2 million in performance equity that he had accrued in his decade with the company. JA2148-2164 (emails asking UBS "to block all the views for Aaron Katzel … We don't want him to see anything"). This was despite Katzel's agreement with UBS giving him the contractual right to "ask for delivery of fully paid securities at any time." *See* JA2061; *see also* JA2063-2064; JA2068-2073.

### III.  PROCEDURAL BACKGROUND

#### a.  OSHA proceedings

As required by Section 806, Katzel filed his initial SOX whistleblower complaint with the Occupational Safety and Health Administration on October 27, 2017. *See* 18 U.S.C. § 1514A(b)(1)(A). AIG moved to dismiss, arguing that Katzel "failed to allege any violation of federal securities laws." *Katzel v. AIG*, (No. 2019-

SOX-00014, Mar. 18, 2019) (ALJ), "OSHA Op." 1.[3] "Instead," AIG believed that Katzel's "allegations, even if true, relate only to mismanagement and to disagreement over strategic business decisions." *Ibid.* Such allegations, according to AIG, "cannot support a claim under SOX." *Ibid.*

Consistent with clear precedent and agency practice, the ALJ noted that Katzel did not need to "specifically identif[y] the statute he believes [AIG's] conduct violated," because "that is not the standard." OSHA Op. 3. Under the proper standard, the ALJ held that "it is conceivable the misconduct [Katzel] allege[d] constituted fraud and thus violated federal laws designed to protect shareholders." *Ibid.*

The ALJ specifically highlighted Katzel's allegations that AIG's "representatives (in particular, the Corporate Development team) intentionally underestimated the potential equity value of a business opportunity (the Kalahari spinoff)"; "improperly revealed confidential information about Project Kalahari to a business competitor"; "destroyed company records related to Project Kalahari," that "senior managers were complicit in this activity"; and that the "misconduct had serious financial consequences for [AIG's] operations and, by extension, its shareholders, because a major business opportunity was lost." OSHA Op. 3. Those

---

[3] *Available at* https://tinyurl.com/yc2jh9nx.

26

allegations, according to the ALJ, were "surely sufficient" to establish a potential violation of "laws 'relating to fraud against shareholders.'" *Ibid.*

### b. District court proceedings

On September 3, 2020, Katzel exercised his statutory right to pursue his SOX whistleblower-retaliation claims in federal district court.[4]

1. After discovery, AIG moved for summary judgment—largely based on the same legal theories the ALJ rejected in the OSHA proceedings. A mere three days after Katzel filed his opposition and over 1,250 additional pages of competing record evidence, the district court granted AIG's motion without holding a hearing. Judge Hellerstein exclusively relied on AIG's characterization of its own evidence. *Compare* SA2 n.1 ("Unless otherwise noted, '¶' refers to the paragraphs in [AIG's] Local Civil Rule 56.1 Statement of Undisputed Material Facts, ECF No. 85."), SA2-SA12 (exclusively citing AIG's Rule 56.1 characterization of AIG's underlying record evidence), *with* JA2212-2274 (Katzel's Counter Statement of Undisputed Material Facts, ECF No. 89), JA951-JA2211 (Katzel's competing 1,250+ pages of record evidence).

---

[4] If the ALJ in an OSHA proceeding does not decide a SOX whistleblower-retaliation complaint within 180 days of its filing, a plaintiff has the statutory right to pursue the action in federal district court. 18 U.S.C. § 1514A(b)(1).

On his federal whistleblower claims, the district court held that Katzel could not "establish a prima facie claim for whistleblower retaliation because the record evidence shows that he did not engage in protected activity, and even if he did, [AIG] lacked knowledge of such activity." SA2. Nor, according to the district court, could Katzel "establish a claim for retaliatory termination because" the court believed there was "no evidence that [AIG] terminated [Katzel] with retaliatory intent." *Ibid.*

The district court held that Katzel could not establish that he engaged in protected activity because he "lacked a reasonable subjective or objective belief that a federal law was violated." SA14. Based solely on Katzel's Code of Conduct certification and response to the annual SOX fraud-risk questionnaire, the court held that a jury could not find that he subjectively believed he was reporting a SOX-enumerated violation. SA15. And the court held that even if Katzel did have such subjective belief, no jury could find his belief objectively reasonable. SA16.

It was not enough, according to the district court, that Katzel reported internal control violations "related to conflicts of interest or document preservation," because the court believed his concerns *also* had to be related to "alleged misrepresentations to shareholders." SA16. Nor was it enough, according to the court, that Katzel raised concerns about internal control weaknesses that could harm "'the company and its shareholders,'" because the court believed he had to *also* claim "that AIG *had* defrauded shareholders or intended to deceive clients or shareholders." *Ibid.*

28

The district court held, for the same reasons, that Katzel could not show that "AIG knew" he had engaged in protected activity. SA16. Because the court had already concluded that Katzel did not engage in a protected activity and that, therefore, AIG was unaware Katzel had engaged in a protected activity, the court concluded that he could not show that he was "terminated … because of such activity." SA17.

In his haste, Judge Hellerstein failed to address Katzel's claim that AIG also retaliated against him in violation of SOX by withholding all his accrued performance equity and causing UBS to enter a zero balance on his accounts for refusing to release his claims while his case was pending. *See* JA305-306 (asserting this claim). The court "decline[d] to exercise supplemental jurisdiction" over Katzel's remaining state law claims, SA17-18, and entered final judgment on September 30, 2022, SA19.

2. On October 28, 2022, AIG filed a motion to amend the judgment under Federal Rules of Civil Procedure 59(e) and 60. JA2357-2375.

AIG noted that Katzel had filed his state law claims in state court, which AIG removed to federal court. JA2362; *see* JA2396-2426 (state complaint); JA2427-2432 (AIG removal). Even though "Katzel had no need to, and did not, rely on diversity jurisdiction in bringing his State Law Claims," AIG argued "it is clear that diversity jurisdiction exists" and thus the district court committed a mistake warranting relief

29

under Rules 59(e) and 60. JA2361. AIG was adamant that the district court should reach Katzel's state law claims so that it could grant summary judgment to the company on those claims. JA2363. Katzel objected, arguing that because he had never pleaded diversity jurisdiction to begin with, the "court cannot have committed the kind of 'clear error' or 'mistaken judgment' required to grant a Rule 59(e) or 60 motion." JA2459.

About two weeks later, the district court granted AIG's motion and awarded summary judgment to the company on Katzel's state law claims. SA20-28. Even though AIG had only argued that Katzel was not contractually entitled to any equity "that *had not vested* prior to his termination," JA141 (emphasis added), the district court held that Katzel was "required to release and waive[]" his claims in order to receive *any* equity—even if it had already long vested by the time he was fired, SA27. With respected to his final performance bonus in 2017, the court held that "Katzel was eligible to receive LTIP Compensation only if he accepted the applicable Award Agreement." *Ibid.* Because Katzel had done neither, the court blessed AIG's termination of the entirety of his equity bonuses. *Ibid.* In doing so, the district court ignored Katzel's argument that AIG expressly lacked the contractual right to eliminate Katzel's separate tranches of equity under the various agreements governing that equity. Finally, the district court held that Katzel could

not establish his tortious interference claim because "he identifie[d] no valid and enforceable contract between him and UBS."[5]

This appeal follows.

## SUMMARY OF ARGUMENT

**I.**     A jury could find that Katzel was terminated in retaliation for engaging in SOX-protected activity.

**a.** 1. A jury could find that Katzel engaged in SOX-protected activity, because there is evidence that he subjectively and reasonably believed he was reporting violations of the SEC's rules relating to internal controls and procedures when he alerted AIG's compliance officers that during Project Kalahari, he witnessed violations of the conflict-of-interest, confidentiality, and document-retention policies the SEC required the company to implement in 2006, and warned

---

[5] Judge Hellerstein originally wrote: "Plaintiff fails to establish a prima facie claim because his injury was caused not by any wrongful conduct by Defendant or third-party AIG but by Plaintiff's own conduct—his failure to sign a release and waiver of claims. In addition, Plaintiff's claim fails because he identifies no valid and enforceable contract between him and AIG." *See* JA2487. The next day, AIG sent a letter to chambers, suggesting that the "references to AIG in 'Defendant or third-party <u>AIG</u>' and a 'contract between him and <u>AIG</u>' appear clearly intended to be references to third-party UBS, given that (i) AIG is the Defendant, not a third party and (ii) the Court found, as AIG had argued, that Plaintiff failed to identify a contract between him and <u>UBS</u>." *Ibid.* Judge Hellerstein replaced and backdated the docketed image of the amended opinion and order, making the changes requested by AIG in its letter to the Judge. *See ibid.*

that material weaknesses in the company's internal control environment could harm the "company and its shareholders." JA202.

The SEC regularly enforces Exchange Act Rules 13a-15(a) and 15d-15(a) for material deficiencies in a company's internal controls and procedures, even when those material weaknesses relate to non-financial information and there has been no alleged shareholder fraud or misstatement to any shareholders. *See Activision Blizzard*, 2023 WL 1765354, at *2; *First Am. Fin. Corp.*, 2021 WL 2439179, at *1, *5. Thus, a jury could find that Katzel was reporting conduct he reasonably believed constituted a violation of Exchange Act Rules 13a-15(a) and 15d-15(a).

The district court erred in holding that Katzel *also* had to show "that AIG *had* defrauded shareholders or intended to deceive clients and shareholders," or that his concerns "were about any alleged misrepresentations to shareholders." SA25. Katzel reported conduct he reasonably believed to violate a "rule or regulation" of the SEC, which is SOX-protected activity. 18 U.S.C. § 1514A(a)(1). A plaintiff is not further required to prove that a fraud had actually occurred or that there were misrepresentations to shareholders.

This Court has confirmed that "a whistleblower need not show that the corporate defendant committed fraud to prevail in her retaliation claim under § 1514A." *Guyden v. Aetna, Inc.*, 544 F.3d 376, 384 (2d Cir. 2008). "The statute only requires the employee to prove that she 'reasonably believe[d]' that the

32

defendant's conduct violated federal law." *Ibid.*; *see Nielsen v. AECOM Technology Corp.*, 762 F.3d 214, 221 (2d Cir. 2014).

That is consistent with agency interpretation. "The SOX's legislative history indicates that [it] was implemented to address not only securities fraud … , but also *corporate fraud generally.*" *Sylvester v. Parexel Int'l LLC*, ARB No. 07-123, 2011 WL 2165854, at *16 (ARB May 25, 2011) (en banc) (emphasis added). Moreover, "Section 806 exists not only to expose existing fraud, i.e., conduct satisfying the elements of a fraud claim, but also to prevent *potential fraud* in its earliest stages." *Id.* at *18 (emphasis added). A whistleblower is therefore protected "as long as the employee reasonably believes that the violation is likely to happen." *Id.* at *13. That is why the ALJ in Katzel's OSHA proceedings correctly held that the facts here are "surely sufficient" to establish a SOX whistleblower-retaliation claim. OSHA Op. 3.

Cases from the Third and Ninth Circuits confirm this understanding as well. In *Wiest v. Lynch*, the Third Circuit reversed a district court that dismissed a SOX whistleblower-retaliation claim for failing to allege "a reasonable belief of an *existing* violation." 710 F.3d 121, 134 (3d Cir. 2013). The court of appeals held that an employee need only have a reasonable "belief that the conduct that is the subject of the communication relates to an existing *or prospective* violation of one of the federal laws referenced in § 806." *Id.* at 134 (emphasis added). And in *Van Asdale v. International Game Technology*, the Ninth Circuit reversed a district court holding

"that no reasonable jury could find" the plaintiff "subjectively believed that shareholder fraud had occurred," despite her testimony that "she 'hadn't reached a conclusion' as to whether fraud had occurred." 577 F.3d 989, 1002 (9th Cir. 2009) (emphasis added). It was enough, according to the court of appeals, that "the context of this statement was [her] discussion of the need for an investigation" into whether a fraud had occurred. *Ibid.*

2. Because the SEC's rules governing internal controls and procedures can be violated without alleged misrepresentations to shareholders or shareholder fraud, the district court erred in relying on AIG's characterizations of Katzel's annual Code of Conduct certification and Fraud Risk Assessment Questionnaire to find that he did not subjectively believe he was reporting a potential violation of a SOX-enumerated law or regulation, without addressing evidence submitted by Katzel showing that those materials supported his belief of such a violation.

In any event, the questionnaire presented limited, specific queries asking whether Katzel knew of an existing fraud related to discrete categories of conduct much narrower than the conduct regulated by the SEC. And the district court failed to address that he responded to the Code of Conduct training prior to completing the SOX fraud-risk questionnaire, which he completed based on advice from AIG's compliance officers, while at the same time calling for an investigation into the

company's internal control environment based on apparent violations of the company's SEC-mandated compliance policies.

3. If this Court disagrees and affirms Judge Hellerstein's ruling, it would significantly impair the SEC's enforcement efforts. Defendants will have a strong argument that material weaknesses in their internal controls and procedures are insufficient to give rise to securities law violations, absent shareholder fraud or misstatements to shareholders, contrary to the SEC's enforcement priorities. *E.g.*, *Activision Blizzard*, 2023 WL 1765354, at *2; *First Am. Fin. Corp.*, 2021 WL 2439179, at *1.

**b.** Because a jury could find that Katzel engaged in protected activity, it follows that the district court erred in holding that no jury could find AIG's executives were aware he engaged in protected activity. Katzel's concerns were reported to senior compliance officials, who then relayed his concerns and the Compliance Department's investigative findings substantiating some of his concerns to the General Counsel. AIG's chief compliance officer testified that she was "absolutely sure that Solmssen was aware of [Katzel]'s concerns" because she had "relayed those concerns to Solmssen" herself. JA1906.

**c.** Finally, a jury could find that Katzel's protected activity was a "contributing factor" in Solmssen's decision to terminate him. *See Murray v. UBS Sec., LLC*, 43 F.4th 254, 259-60 (2d Cir. 2022), *petition for cert. filed*, No. 22-660

35

(U.S. Jan. 18, 2023) (distributed for Conference of April 21, 2023). Given that Katzel was terminated shortly after the company quietly adopted new policies to address his whistleblowing concerns, and that Solmssen rated him as having "Fully Met" his expectations and awarded him his full discretionary bonus shortly before terminating him, a jury is entitled to reject Solmssen's inconsistent post hoc justifications. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846-87 (2d Cir. 2013).

**II.**    The district court erred in failing to address Katzel's post-termination SOX retaliation claim. Under Section 806(a)(2), "the filing of a whistleblower complaint" is *itself* "a SOX protected activity." *McClendon*, 2006 WL 6577175, at *76. AIG was prohibited from terminating all the performance equity that Katzel had earned over a decade with the company for refusing to waive and release his pending whistleblower claims. A jury should decide whether Katzel's decision to pursue a whistleblower suit was a "contributing factor" in AIG's decision to terminate the entirety of his accrued LTIP equity.

**III.**    The district court erred in holding that to receive the performance equity he had earned over ten years with AIG, Katzel had to sign the 2017 award agreement related to his final performance bonus and a release of claims as to *all* of his earned equity.

36

**a.** AIG itself acknowledged that under the relevant contracts, Katzel was only required to sign a full waiver and release "to receive his *unvested LTIP* compensation." JA109. Much of his equity had already vested by the time AIG terminated him.

**b.** As to all of his equity, it is unlawful to contractually condition the receipt of an earned benefit on a terminated employee forgoing his whistleblower rights. The district court did not address Katzel's argument that AIG improperly withheld his performance equity by conditioning those awards on signing a release of claims while his complaint was pending, thus violating SEC policy "against requiring a whistleblower to forego his whistleblower claim in order to receive compensation he had already earned." JA2290.

**IV.** The district court erred in holding that Katzel failed to identify a valid and enforceable contract with UBS.

Katzel identified documents from UBS providing that Katzel had the right to "ask for delivery of fully paid securities *at any time*." JA2061 (emphasis added). If that were not enough, those documents "expressly refer to the generally applicable account agreements that govern his account," and link to them. *See* JA2272. Because AIG is indisputably aware of those agreements and improperly interfered with Katzel's rights vis-à-vis UBS anyway, a jury could find that AIG tortiously interfered with Katzel's contractual rights with UBS.

## STANDARD OF REVIEW

This Court reviews "the district court's decision to grant summary judgment de novo, resolving all ambiguities and drawing all permissible factual inferences in favor of" Katzel, the non-moving party. *See Ziparo v. CSX Transportation, Inc.*, 15 F.4th 153, 158 (2d Cir. 2021) (quotation marks omitted). Reversal is warranted when the district court decides "to weigh the evidence and determine the truth of the matter," instead of determining "whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quotation marks omitted).

## ARGUMENT

### I.  A JURY COULD FIND THAT KATZEL WAS TERMINATED IN RETALIATION FOR ENGAGING IN SOX-PROTECTED ACTIVITY.

The district court held that (a) Katzel neither objectively nor subjectively believed he was engaging in protected activity. Based on that holding, the court then held that (b) AIG could not have been aware that Katzel had engaged in protected activity, and therefore (c) he could not show that his protected activity was a "contributing factor" in the decision to terminate him. Because there is a material dispute of fact on each of these points, the Court should reverse and remand for a jury to decide whether AIG unlawfully fired Katzel for engaging in SOX-protected activity.

### a. A jury could find that Katzel "reasonably believed" he reported potential violations of "any rule or regulation" of the SEC or shareholder fraud.

A plaintiff engages in SOX-protected activity when he (1) provides information, (2) "regarding any conduct which the employee reasonably believes constitutes a violation of … any rule or regulation of" the SEC or shareholder fraud, to (3) "a person with supervisory authority over the employee" or a compliance officer who "has the authority to investigate, discover, or terminate misconduct." 18 U.S.C. § 1514A(a)(1). There is no dispute that Katzel "reported certain conduct (provided information) to a person with supervisory authority, satisfying the first and third prongs of protected activity." SA24. But as to the second prong, the district court held that no jury could find that Katzel had "a reasonable subjective or objective belief that a federal law was violated." *Ibid.* That is wrong.

1. Katzel reported conduct he reasonably believed to violate a "rule or regulation" of the SEC because the apparent conflict-of-interest, confidentiality, and document-retention policy violations he witnessed during Project Kalahari and reported concerned the very internal controls and procedures the SEC required AIG to promulgate in 2006—the year he was first hired by AIG. *Supra* pp. 12-14; *see* JA2208. Moreover, Katzel was explicit that those violations exposed material weaknesses in AIG's internal control environment that could result in harm to "the company and its shareholders." JA1309. A jury could surely find that Katzel

39

reasonably believed such warnings related to a potential violation of the SEC's rules governing internal controls and procedures.

As explained above, the SEC regularly enforces Exchange Act Rules 13a-15(a) and 15d-15(a) against companies for internal control failures, even when those failures are non-financial and there is no allegation that the vulnerabilities caused a material misrepresentation or otherwise led to shareholder fraud. *Supra* pp. 8-10. When a public company "fails to implement and maintain disclosure controls and procedures as required, its management *may* not have adequate information to assess whether the disclosures it makes to investors are fulsome, accurate, and not misleading by omission." *Activision Blizzard*, 2023 WL 1765354, at *2 (emphasis added).

AIG recognizes that Katzel expressly "raised three concerns": "(1) that 'the process with which the company pursued strategic transactions had serious gaps that meant that it could not be assured that those transactions were being pursued in a way that maximizes the value to the company,'"; "(2) 'that the internal control environment surrounding preservation of business records was inadequate' because he believed that 'the notes underlying Corporate Development's surveys have been destroyed'"; and "(3) that 'enforcement of the compliance policies of the company including how sensitive confidential information and business secrets were treated and compliance with antimonopoly policy' might be inadequate because AIG shared

confidential information about LOC with Accenture, which Katzel believed was 'looking to bid to provide services to AIG.'" JA937-938 (AIG Statement of Undisputed Material Facts) (quoting JA216-219; cleaned up). There should be little question that those warnings reasonably related to potential weaknesses in the internal controls required under Exchange Act Rules 13a-15 and 15d-15.

The district court erred in holding that Katzel *also* had to show "that AIG *had* defrauded shareholders or intended to deceive clients and shareholders," or that his concerns "were about any alleged misrepresentations to shareholders." SA25. Katzel had already reported conduct he reasonably believed to violate a "rule or regulation" of the SEC, which is SOX-protected activity. 18 U.S.C. § 1514A(a)(1). A plaintiff is not further required to show either that a fraud had actually occurred, or that there were alleged misrepresentations to shareholders. Precedent from this Court, agency interpretation, and cases from other federal courts of appeals agree.

This Court has affirmed that "a whistleblower need not show that the corporate defendant committed fraud to prevail in her retaliation claim under § 1514A." *Guyden v. Aetna, Inc.*, 544 F.3d 376, 384 (2d Cir. 2008). "The statute only requires the employee to prove that she 'reasonably believe[d]' that the defendant's conduct violated federal law." *Ibid.* Thus, a whistleblower plaintiff like Katzel need not show that his warnings "related 'definitively and specifically'" to an existing violation of a particular SEC rule or regulation or shareholder fraud.

41

*Nielsen v. AECOM Technology Corp.*, 762 F.3d 214, 221 (2d Cir. 2014) (quoting

*Sylvester v. Parexel Int'l LLC*, ARB No. 07-123, 2011 WL 2165854, at *11-12, *14-

15 (ARB May 25, 2011) (en banc)).

This is consistent with agency interpretation as well. "The SOX's legislative

history indicates that [it] was implemented to address not only securities fraud … ,

but also *corporate fraud generally*." *Sylvester*, 2011 WL 2165854, at *16 (citing S.

Rep. No. 107-146, at 2) (emphasis added). And "Section 806 exists not only to

expose existing fraud, i.e., conduct satisfying the elements of a fraud claim, but also

to prevent *potential fraud* in its earliest stages." *Id.* at *18 (emphasis added); *see*

*Nielsen*, 762 F.3d at 221 (*Sylvester* due at least *Skidmore* deference). A

whistleblower is therefore protected "as long as the employee reasonably believes

that the violation is likely to happen." *Sylvester*, 2011 WL 2165854, at *13. That is

why the ALJ in Katzel's OSHA proceedings correctly held, contrary to the district

court here, that Katzel sufficiently set forth "a claim under SOX." OSHA Op. 3.

Indeed, the ALJ did not say Katzel reasonably believed there was a potential

violation; she held that his allegations plausibly "constituted fraud and thus violated

federal laws designed to protect shareholders." *Ibid. A fortiori*, it was at least

*reasonable* for Katzel to believe that "misconduct" that has "serious financial

consequences for [AIG]'s operations and, by extension, its shareholders, because a

major business opportunity was lost," is related to a potential SOX-enumerated violation. *See ibid.*

This court's sister circuits agree. The Third Circuit in *Wiest v. Lynch* reversed a district court that dismissed a SOX whistleblower-retaliation claim based on the plaintiff's failure to allege "a reasonable belief of an *existing* violation." 710 F.3d 121, 133 (3d Cir. 2013) (quotation marks omitted). The Third Circuit reasoned that "Section 806 protects an employee's communication about a violation that has not yet occurred 'as long as the employee reasonably believes that the violation is likely to happen.'" *Ibid.* (quoting *Sylvester*, 2011 WL 2165854, at *13). Thus, an employee need only have "a subjective and an objective belief that the conduct that is the subject of the communication relates to an existing *or prospective* violation of one of the federal laws referenced in § 806." *Id.* at 134 (emphasis added).

The Third Circuit's decision is also instructive because the court of appeals agrees that reporting perceived violations of a company's internal controls can constitute protected activity even when those complaints are not specifically related to financial disclosures or material misstatements to shareholders. Among other protected activity, it was sufficient, according to the Third Circuit, that the plaintiff "was presented with a request for approval of a conference … in the amount of $335,000," and the company "processed the payment without the CEO's approval, in violation of [the company]'s internal policies." *Wiest*, 710 F.3d at 125. "Approval

43

authorities exist," the court reasoned, "to ensure that large expenditures are undertaken for appropriate business purposes," and "[e]xpenditures for which required approvals have not been obtained raise the specter that they are not undertaken for an appropriate business purpose." *Id.* at 137 n.6. Because "such expenditures could plunder corporate assets for the benefit of those attending lavish events," the court concluded that the plaintiff sufficiently alleged "an objectively reasonable belief" that a SOX-enumerated violation had occurred. *Ibid.* If internally reporting a company policy violation related to $335,000 is enough to engage in SOX-protected activity, surely reporting suspicious behavior regarding an asset with a potential equity value of over $750 million is as well.

And in *Van Asdale v. International Game Technology*, the Ninth Circuit held that even when the gravamen of a plaintiff's internal reporting is suspected shareholder fraud, the plaintiff need not assert or be able to demonstrate that a fraud had actually occurred to engage in protected activity—plaintiffs only "need show that they reasonably believed that there *might* have been fraud and were fired for even suggesting further inquiry." 577 F.3d 989, 1001 (9th Cir. 2009) (emphasis added). In *Van Asdale*, the district court held—as Judge Hellerstein held in this case—"that no reasonable jury could find that" the plaintiff "subjectively believed that shareholder fraud had occurred," based on her testimony "that an investigation needed to be conducted to see *if* a fraud had occurred." *Id.* at 1002 (emphasis added).

Much like the process under AIG's annual Code of Conduct certification and Fraud Risk Questionnaire, the plaintiff there was asked: "So you didn't have a specific belief that a fraud had occurred?" *Ibid.* Like Katzel, the plaintiff responded that she "had a belief that an investigation needed to occur," but that she "hadn't reached a conclusion one way or another as to fraud." *Ibid.*

The Ninth Circuit reversed the district court, holding that there was a dispute of material fact over whether the plaintiff engaged in protected activity even though she "acknowledged that she 'hadn't reached a conclusion' as to whether fraud had occurred." *Van Asdale*, 577 F.3d at 1002. It was sufficient, according to the court, that the "context of this statement was [her] discussion of the need for an investigation." *Ibid.* "Requiring an employee to essentially prove the existence of fraud before suggesting the need for an investigation," the court reasoned, "would hardly be consisted with Congress's goal of encouraging disclosure." *Ibid.*

2. Given the above, there is a material dispute of fact notwithstanding Katzel's earlier response to the annual Code of Conduct certification or the cautiously tailored wording he used to complete the fraud-risk questionnaire. The Code of Conduct certification was completed *before* Katzel consulted with the Compliance Department and reported the suspicious activities he witnessed. And a jury could credit Katzel's explanation that he responded to these forms as he did because he had reason to suspect, but was not certain at the time, that a fraud had

45

occurred. Everyone agrees that Katzel reported suspicious behavior in connection with a significant transaction through the company's annual SOX fraud-risk assessment process, and that his reporting prompted an investigation substantiating some of his concerns.

In all events, the district court erred in finding that Katzel did not have a subjective belief that a potential violation of an SEC rule or regulation had occurred solely based on his certifications, because they were confined to a discrete set of categories much narrower than the topics regulated by the SEC's rules governing internal controls. The Fraud Risk Assessment Questionnaire was narrowly limited to asking whether the employee had "any knowledge of any fraud perpetrated or alleged or suspected that could result in a material misstatement of AIG's financial statements" or "any other fraud at AIG, perpetrated, alleged or suspected, regardless of materiality," solely with regard to: conflict-of-interest schemes in which "an employee or agent has an undisclosed personal or economic interest in a matter that could influence his or her professional role, e.g., overbilling a company for goods or services where an employee has an undisclosed ownership or financial interest"; bribery schemes; illegal gratuities schemes; and economic extortion schemes. JA1606.

Based on advice he received from compliance officials, Katzel ultimately attested that he did "not have any specific knowledge of any fraud that would fall

into the categories described." JA1874. But we know that the SEC regulates conduct much broader than what is described in these discrete categories. *Supra* pp. 6-8. And as explained, his activity is protected even though he did not report an "existing" violation. "Section 806 exists … to prevent potential fraud in its earliest stages." *Sylvester*, 2011 WL 2165854, at *18. Affirming the district court's contrary holding would render the SEC's whistleblower protections meaningless, absent clear reporting of actual fraud—a result that would significantly undermine the ability of issuers and the SEC to identify and prevent corporate fraud before it occurs. *But see Van Asdale*, 577 F.3d at 1002.

3. Relatedly, if this Court disagrees and affirms Judge Hellerstein's ruling that a jury could not find that Katzel even reasonably believed his concerns were related to the SEC's rules governing internal controls and procedures, it will significantly impair the SEC's enforcement efforts. Such a ruling will provide defendants with a strong argument that even when the SEC discovers that a company fails to satisfy the Commission's internal controls and procedures requirements, the SEC must also show that the violation gave rise to specific instances of shareholder fraud. *But see Activision Blizzard*, 2023 WL 1765354, at *1-2; *First Am. Fin. Corp.*, 2021 WL 2439179, at *1, *5. This would result in a sea change in applicable SOX law in the Second Circuit and contravene precedent from its sister courts. *Supra* pp. 41-45.

47

At a minimum, such a result would deter potential whistleblowers from reporting violations or weaknesses of an issuer's disclosure controls until a completed act of fraud against the company's shareholders has already occurred. *Contra supra* pp. 41-45. Affirming the district court's ruling would gut any meaningful deterrence value of the internal control framework so critical to compliance with the SEC's rules and regulations. And it would deprive the SEC of information from whistleblowers who might otherwise prompt the Commission to undertake an investigation.

> **b.** **A jury could find that AIG was aware that Katzel engaged in protected activity.**

Because a jury could find that Katzel engaged in protected activity, it follows that a jury could find that AIG's executives were aware he engaged in protected activity.

The district court held as a matter of law that "AIG could reasonably rely on" Katzel's 2016 attestations he was unaware of any specific instances of existing fraud. SA26. As discussed above, however, he did not need to report an existing fraud to engage in protected activity. *Supra* pp. 41-45. And here, too, the district court improperly resolved material factual disputes at the summary judgment stage by relying solely on evidence presented by AIG—specifically, that "all of Plaintiff's supervisors testified that they did not perceive" him "as expressing any belief that

AIG employees were committing fraud or violating the rules or regulations of the SEC." SA26.

A jury need not credit that testimony, given AIG's acknowledgment that Katzel warned that internal controls related to preservation of business records, confidentiality, and conflicts of interest were "inadequate," JA938, and the Compliance Department's own investigative findings that Katzel had reported conduct that arguably violated the company's confidentiality policy, JA1955. To the extent the district court relied on Solmssen's testimony "that if there were intimations of fraud, that would have sparked his interest," SA26, this is belied by the testimony of AIG's own chief compliance officer, who was "absolutely sure that Solmssen was aware of [Katzel]'s concerns" because she had "relayed those concerns to Solmssen" herself. JA1906. A jury could properly credit her testimony that "to the extent that Solmssen testified that he was unaware that Katzel had raised concerns regarding the issues" with Project Kalahari, Solmssen "would be mistaken." *Ibid.*

### c. A jury could find that Katzel's protected activity was a "contributing factor" in AIG's decision to terminate him.

Finally, a jury could find that Katzel's protected activity was at least part of the reason Solmssen terminated him.

This Court has held that "to prevail on the 'contributing factor' element of a SOX antiretaliation claim, a whistleblower-employee must prove that the employer

took the adverse employment action against the whistleblower-employee with retaliatory intent—i.e., an intent to 'discriminate against an employee ... because of' lawful whistleblowing activity." *Murray v. UBS Sec., LLC*, 43 F.4th 254, 259-60 (2d Cir. 2022) (alteration in original).[6]

The district court held that Katzel "cannot show that he was terminated with retaliatory or discriminatory intent" because, "[a]s discussed above, none of [his] supervisors understood him to be engaging in whistleblowing when he raised his concerns." SA27. Because Katzel has established that a jury could find he was engaging in protected activity and that Solmssen was aware he was engaging in protected activity, this holding of the district court must fall as well. Reversal is warranted on this basis alone.

In any event, there is an abundance of evidence from which a jury could find that Katzel's reporting was a contributing factor in Solmssen's decision to terminate him. "This Court has long recognized the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on

---

[6] This Court expressly acknowledged creating a split with the Fifth and Ninth Circuits, which hold that "retaliatory intent is not an element of a section 1514A claim." *Murray*, 43 F.4th at 261. A petition for a writ of certiorari on the question is currently pending before the U.S. Supreme Court, and has been distributed for the April 21, 2023 Conference. *See* Petition for Writ of Certiorari, *Murray v. UBS Secs., LLC* (U.S. Jan. 18, 2023) (No. 22-660). As set forth herein, a jury could easily find for Katzel either way.

a dispute as to the employer's intent." *See Walsh v. New York City Hous. Auth.*, 828 F.3d 70, 74 (2d Cir. 2016) (quotation marks omitted). Solmssen's post hoc justifications for the termination—contradicted by the contemporaneous reasons given for terminating Katzel—and the suspicious timing between his firing and AIG's overhaul of the very internal policies comprising the controls over which Katzel raised the alarm preclude summary judgment.

An employer's "shifting and somewhat inconsistent explanations for [an employee]'s termination" and "temporal proximity between [his] protected conduct and [his] termination are sufficient to create a triable issue of fact with regard to whether" the termination is retaliatory. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846-87 (2d Cir. 2013) (applying this standard in the stricter Title VII "but-for" context). A "plaintiff may rely on evidence comprising [his] prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Id.* at 867.

Solmssen supplied inconsistent justifications for terminating Katzel at various times. AIG's Human Resources office contemporaneously documented that Solmssen wanted to terminate Katzel because the LOC headcount would be reduced and "have a smaller span of responsibility," and Katzel "was not deemed a fit" to continue in his role. JA2033. When he terminated Katzel, Solmssen told him "we're going in a different direction." JA1337-1338. Neither of these rationales is consistent

with Solmssen's later testimony that Katzel's "performance wasn't up to par." JA1339, *see* JA1504-1505, JA1534. These justifications are also inconsistent with the fact that Solmssen reviewed Katzel as having "Fully Met" his expectations and awarded him his full performance bonus shortly before terminating him. Again, Solmssen never gave Katzel a formal performance warning or placed him on a performance improvement plan, as was customary at AIG in the case of poorly performing employees.

Moreover, despite the contemporaneous justifications to reduce the headcount in the LOC and narrow its scope, Solmssen subsequently appointed his former colleague Rose Marie Glazer to replace Katzel as the acting head of the LOC and never instructed her to make any changes to its operations nor reduce its headcount. JA1482-1484. In fact, Solmssen testified that rather than instruct Glazer to reduce the LOC headcount—the purported justification for terminating Katzel—he gave her two directives: to "*keep*" "talented people in the LOC" and to make it "effective." JA1489 (emphasis added). Nowhere did Solmssen direct Glazer to reduce the LOC's headcount, change its model to cover "a smaller span of responsibility," or move "some responsibilities" out of it. *See* JA2033 (HR's justifications for terminating Katzel). Solmssen's credibility is also questionable based on chief compliance officer Nelson's testimony that she was "absolutely sure" she had "relayed

[Katzel]'s concerns to Solmssen," and Solmssen's testimony to the contrary was "mistaken." *See* JA1906.

AIG argues that Solmssen terminated Katzel because he was unwilling to make changes to the LOC or reduce its headcount. JA132-133. But Katzel has presented competing testimony that "there was no insubordination." *See, e.g.*, *Perez v. Progenics Pharms., Inc.*, 965 F. Supp. 2d 353, 367 (S.D.N.Y. 2013) (holding that this kind of competing evidence creates a triable issue of fact). It is for a jury to weigh the credibility of their competing testimony. *See Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

Finally, Solmssen's decision to terminate Katzel's access to his contacts without warning and have him escorted out of the building is further evidence of retaliatory animus. Other senior executives were not treated similarly. For example, when Perera was asked, "In connection with your departure, were you escorted out of the building," he testified "No, quite the opposite," and he was given a transition period. JA1250. Evidence that a plaintiff "was escorted out of the building" is evidence "from which rational jurors" may find animus. *See Ogelsby v. W. Stone & Metal Corp.*, 230 F. Supp. 2d 1184, 1191 (D. Or. 2001).

## II.  THE DISTRICT COURT ERRED IN FAILING TO ADDRESS KATZEL'S POST-TERMINATION RETALIATION CLAIM.

The district court did not address Katzel's claim that by depriving him of his earned equity after he filed his whistleblower-retaliation complaint, AIG further retaliated against him in violation of SOX. Reversal is warranted on this claim.

AIG argued that because the complaint "rehashed the same grievances that he reported to AIG related to Project Kalahari, AIG is entitled to summary judgment on" Katzel's post-termination retaliation claim as well. JA134. Put differently, AIG believes that Katzel cannot establish a post-employment retaliation claim because "the allegations raised in Katzel's OSHA complaint did not constitute protected activity under SOX." *Ibid.*

That is entirely contrary to the ALJ's opinion rejecting those very arguments. *See* OSHA Op. 3. In any event, filing and pursuing a whistleblower-retaliation claim is *itself* a SOX protected act. *McClendon*, 2006 WL 6577175, at *76; *see also Hendrix*, 2004 WL 5345479, at *9. This Court should remand and allow a jury to decide whether Katzel's whistleblower proceedings were a "contributing factor" in AIG's decision to deprive him of all his accrued LTIP equity.

AIG also argued that depriving Katzel of his earned equity cannot be considered retaliatory because Katzel refused to sign the 2017 Award Agreement and waiver and release of claims during the pendency of this dispute. JA135-138. For the reasons set forth below, that is wrong.

54

**III.** **THE DISTRICT COURT ERRED IN HOLDING THAT KATZEL IS NOT ENTITLED TO ANY OF HIS ACCRUED EQUITY.**

    **a.** **The parties agree that under the express terms of the relevant contracts, Katzel is entitled to the equity that had already vested when he was terminated.**

In arguing for summary judgment, AIG itself acknowledged that per the terms of the 2013 and 2017 LTIP agreements governing Katzel's earned equity, he was only required to sign a full waiver and release "to receive his *unvested LTIP* compensation." JA109 (emphasis added). According to AIG, it had no "obligation to pay his LTIP Compensation *that had not vested* prior to his termination." JA141 (emphasis added); *see also* JA137 (same).

That is surely correct. Both agreements provide: "In the case of a Participant's involuntary Termination without Cause, … as a condition of receiving delivery of any Shares (or cash) under any Awards *following such event*, the company will require the Participant to execute a release." JA772 ("Release of Claims" provision in 2013 agreement) (emphasis added); JA217 (same in 2017 agreement). By the plain terms of the contracts, any shares that vested and were delivered *before* Katzel's termination are not subject to this condition. That is why these provisions further specify that a release must be executed "prior to or during the calendar year of the date on which a delivery of Shares (or cash) with respect to the Award *is scheduled to be delivered* pursuant to" the delivery provisions, JA772; JA2173

(emphasis added), which require delivery "as promptly as administratively practicable following the Scheduled Vesting Date," JA770; JA2170.

As set out in the 2013 LTIP agreement, Katzel's equity awards would "vest in three equal annual installments on January 1 of the year immediately following the end of the Performance Period and January 1 of each of the next two years (each, a 'Scheduling Vesting Date')," and "AIG will deliver (or cause to be delivered) to the Participant Shares … as promptly as administratively practicable following the applicable Scheduled Vesting Date." JA770. Only his *final* performance bonus provided that his equity would vest entirely after his termination. *Compare* JA2170 (equity "will vest on the date or dates specified in the applicable award agreement"), *with* JA2186 (schedule providing that 2017 LTIP award would vest on January 1, 2020). Thus, much of Katzel's performance equity had already long vested and been delivered into his UBS account by the time of his termination. *See* JA2139 (reflecting 6,610 "Actual Shares Vested" of Katzel's 2013 performance bonus award); JA2140 (reflecting 2,366 "Actual Shares Vested" of Katzel's 2014 performance bonus award). AIG's attempt to claw back the equity that had already vested and been delivered into Katzel's UBS account is a blatant violation of these contracts. Not even AIG defends it. *See* JA140-141.

Even with respect to Katzel's unvested performance equity, AIG lacked any contractual right to terminate any shares unless Katzel failed to execute a release by

the last day of the calendar year in which AIG was to deliver that vested tranche of shares. JA772; JA2173. Thus, for example, AIG was not permitted to terminate any of the shares in Katzel's final equity award until January 1, 2021—after the last day of the year in which those awarded shares were scheduled to vest and be delivered, *see* JA2186 (final award shares scheduled to vest January 1, 2020); JA2170 (vested shares to be delivered "as promptly as administratively practicable"); JA2172-73 ("The Release … must be executed … prior to or during the calendar year of the date on which a delivery of Shares (or cash) with respect to the Award is scheduled to be delivered …."). AIG first instructed UBS to terminate Katzel's equity and prevent him from accessing his accounts in March 2018, JA2148-2149, years before that date had occurred.

The district court failed to address any of this, which is not surprising as it failed to cite any of the applicable agreements, let alone determine the meaning of the relevant provisions. *See* SA27. Judge Hellerstein's disregard of the governing contracts caused real and significant harm to Katzel, judicially blessing AIG's extra-contractual, retaliatory elimination of $1.2 million of Katzel's property. Again, not even AIG agrees with that interpretation of the contracts. This uncontested error in the district court's reasoning requires reversal.

### b. AIG cannot condition the receipt of an earned benefit on Katzel forgoing his whistleblower rights.

Regarding any shares that had not vested and been delivered, or those that were subject to the 2017 Award Agreement, AIG could not condition the receipt of Katzel's earned performance equity on him giving up his rights to pursue his already-pending whistleblower claims. It is unlawful for a company like AIG to insert contract conditions that interfere with an employee's ability to engage in protected activity—whether the company is attempting to interfere with whistleblowing directed at the SEC or to prevent a private suit under Section 806.

The SEC prohibits employers from taking any action to prevent an employee from directly contacting the SEC to report a possible securities law violation. 17 C.F.R. § 240.21F-17(a). The SEC makes it an enforcement priority to combat such abuse. *See, e.g.*, *In re The Brink's Company*, Exchange Act Release No. 95138 (June 22, 2022), https://tinyurl.com/24kxe8jz; *In re Guggenheim Securities, LLC*, Exchange Act Release No. 92237 (June 23, 2021), https://tinyurl.com/3f3ewjh.

While Commission Rule 21F-17(a) makes it unlawful to discourage employees from reporting directly to the SEC, Section 806 makes it unlawful to discriminate in the terms and conditions of employment against employes who "file" and "participate in" a civil action pursuant to that provision. 18 U.S.C. § 1514A(a)(2); *see supra* p. 11.

58

AIG insisted that Katzel had to sign a waiver providing that he "waives and forever releases and discharges any and all claims of any kind" that he "may have against [AIG]," and that he "acknowledges that [he] has not filed any complaint, charge, claim or proceeding, if any," against AIG and "any of the Released Parties before any local, state or federal agency, court or other body." JA783; JA2183. So too, the 2017 Award Agreement applicable to Katzel's final performance bonus included provisions allowing AIG to claw back any awards should the company decide "any action or omission by" Katzel "resulted in material financial or reputational harm to AIG." JA2188. It would also have required Katzel to inaccurately state that he was unaware of any "risk" that "resulted in a material adverse impact on AIG, any of AIG's business units or the broader financial system"—undermining the very allegations giving rise to Katzel's claims. *Ibid.*

Katzel informed AIG that he did not wish to sign the 2017 Award Agreement until his whistleblower-retaliation proceedings were complete. "At the time … the company requested that I enter into the award agreement," Katzel testified, "this dispute was already pending." JA173. Katzel relayed that "during the pendency of a dispute, my expectation would be that ordinarily that sort of provision would be stayed." *Ibid.*

AIG's insistence that Katzel must sign agreements that would compromise his pending claims to obtain the performance equity he had earned violates Section

806(a)(2)'s prohibition on "discriminat[ing] in the terms and conditions of employment because … the employee … file[s]" and "participate[s] in" a civil action pursuing a whistleblower-retaliation claim. 18 U.S.C. § 1514A(a)(2).

## IV. THE DISTRICT COURT ERRED IN HOLDING THAT KATZEL FAILED TO IDENTIFY A VALID AND ENFORCEABLE AGREEMENT WITH UBS.

The sum total of Judge Hellerstein's reasoning for granting AIG summary judgment on Katzel's tortious-interference-with-contract claim was that his injury was caused by "his failure to sign a release and waiver of claims" and he otherwise "identifies no valid and enforceable contract between him and UBS." SA28. Neither is correct. For the reasons just stated, the release and waiver of claims necessarily have nothing to do with the shares that had vested and been delivered into his account with UBS. As to the court's second point, the court once again entirely ignored the record evidence Katzel set forth establishing a valid and enforceable agreement with UBS.

To make out a claim for tortious interference with contract under New York law, Katzel must prove "the existence of a valid contract with a third party, the defendant's knowledge of that contract, the defendant's intentional and improper procurement of a breach of that contract, and damages." *Stuart's, LLC v. Edelman*, 196 A.D.3d 711, 712 (N.Y. App. Div. 2021). He has established every element.

*First*, Katzel identified an April 2016 Investment Account statement from UBS that "itemizes securities and other assets held in the account at the end of the

statement period" and provides Katzel the right to "ask for delivery of fully paid securities *at any time*." JA2061 (emphasis added); *see* JA2271 (identifying Ex. 117, at JA2052-2061). This is unquestionably evidence of "the existence of a valid contract with third party" UBS. *See Stuart's, LLC*, 196 A.D.3d at 712. These statements, Katzel explained, also "expressly refer to the generally applicable account agreements that govern his account," which UBS links to therein. *See* JA2272.

*Second*, AIG undoubtedly had knowledge of the agreement, given that UBS administers the brokerage and custodial accounts of all AIG employees who have LTIP equity. *Third*, AIG clearly interfered with the contractual rights Katzel cited in the preceding paragraph. Again, he had the right to "ask for delivery of fully paid securities at any time." JA2061. Nevertheless, AIG employees directly interfered with those rights by attempting to claw back the equity that had already vested and been delivered into Katzel's brokerage and custodial account with UBS. In March 2018, AIG human resources officer Terri Kuhr emailed UBS EPAS Plan Administrator Joannie Orrico, stating that that AIG "want[ed] to block all the views for Aaron Katzel …. We don't want him to see anything – can that be done"? JA2149. Orrico responded: "I put the view restriction on all." JA2148. Kuhr replied "Great – thanks." *Ibid.*

In February 2020, Kuhr emailed Orrico again, conveying that "in the new OneSource I see the various grants – can [Katzel] see this too[?] Is there any way to block it out like we did previously[?]" JA2160. Orrico responded: "He can see them – it looks like we only blocked from transaction not view." *Ibid.* Kuhr replied "NOOOO – we blocked his view – why did it get unblocked"? JA2162. As of now, Katzel is unable to access his equity or view his accounts. *See* JA2202.[7]

*Fourth*, Katzel has unquestionably been harmed by the elimination of over $1.2 million in hard earned performance equity he accrued over a decade at AIG. This is surely sufficient evidence for a jury to find that AIG tortiously interfered with Katzel's agreement with UBS. The Court should reverse and remand.

## CONCLUSION

For the reasons set forth above, this Court should reverse the district court and remand for further proceedings.

---

[7] AIG failed to produce any of this incredibly probative and responsive evidence in discovery. Rather, UBS provided these emails to Katzel pursuant to his third-party subpoena.

62

Dated: April 20, 2023    Respectfully submitted,

           */s/ Daniel Woofter*

Neal Brickman      Daniel Woofter
THE LAW OFFICES OF NEAL  GOLDSTEIN, RUSSEL &
 BRICKMAN, P.C.     WOOFTER, LLC
420 Lexington Ave.     1701 Pennsylvania Ave., NW
Suite 2811       Suite 200
New York, NY 10170    Washington, DC 20006
(212) 986-6840     (202) 240-8433

    *Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit of 2d Cir. R. 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,993 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word 365 Office in 14-point Times New Roman font.

Dated: April 20, 2023                        */s/ Daniel Woofter*
                                                               Daniel Woofter

## CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2023, I caused the foregoing document to be electronically filed with the Clerk of Court for the U.S. Court of Appeals for the Second Circuit by using the appellate CM/ECF system. I certify that all participants in this case are registered users of that system and that service will be accomplished by that system.

Dated: April 20, 2023          */s/ Daniel Woofter*
                                         Daniel Woofter